UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, et al.,                    )
                                           )
        Plaintiffs,                        )
                                           )
        v.                                 )          Case No. 4:17 CV 24 CDP
                                           )
BRIDGETON LANDFILL, LLC, et al.,           )
                                           )
        Defendants.                        )

## SECOND AMENDED COMPLAINT

COME NOW Plaintiffs Michael Dailey and Robbin Dailey, by and through their counsel, and for their Second Amended Petition against Defendants Bridgeton Landfill, LLC, Rock Road Industries, Inc, Republic Services, Inc., Allied Services, L.L.C., and Cotter Corporation, state and allege as follows:

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began seven decades ago, when a government contractor began processing uranium ores in downtown St. Louis City. The hazardous, toxic, carcinogenic, radioactive mill tailings wastes resulting from the processing of these ores are ounce for ounce some of the most dangerous materials on the planet. Despite knowing that these materials were some of the most harmful substances on Earth, Defendants treated these hazardous, toxic, carcinogenic, radioactive mill tailings wastes with about the same level of care that a reasonable person might give to common household garbage, dumping it without authority from the State of Missouri and in violation of law, like everyday trash into the West Lake Landfill—a landfill which experts indicate is not even suitable for garbage, as it contains no liner.

1

2.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families. These everyday St. Louisans now find their lives disrupted, their homes contaminated, their businesses upended, and their properties devalued. They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

3.      Tests conducted by representatives of the United States of America and others now confirm that the areas around the West Lake and Bridgeton Landfills (referred to herein as the "Landfill" which consists of several inactive landfills including West Lake and Bridgeton) are contaminated with the same radioactive mill tailings wastes generated in the processing of uranium ores in the St. Louis area. The off-site radioactive mill tailings wastes found today in the real property, which contains businesses and homes, surrounding the Landfill has the fingerprint (or profile) of the ore processed in St. Louis which generated the hazardous, toxic, carcinogenic, radioactive mill tailings wastes that were dumped into and around the Landfill.

4.      These radioactive mill tailings wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

5.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the

2

widespread damage they have caused. Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

6.      It is time that Defendants finally be held accountable for their reckless and tortious conduct. This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

7.      Plaintiffs Michael Dailey and Robbin Dailey (hereinafter "Plaintiffs") own property in Bridgeton, Missouri that Defendants contaminated. The Dailey Property, including the land and Plaintiffs' home (hereinafter "Dailey Home"), is contaminated with radioactive material from the Landfill. The radioactive material consists of high levels of Uranium (U-238) decay products, including Thorium (Th-230), Lead (Pb-210), and Radon (Ra-226). Dusts inside the Dailey Home were shows to contain radioactive Th-230 at levels at least two hundred times higher than Background levels, as depicted in the graphic immediately below.

3



8.     Plaintiffs Michael Dailey and Robbin Dailey have sustained significant damages as a result of Defendants' conduct. Defendants should remediate the Dailey Home and compensate Plaintiffs for their damages, and provide further relief as set forth below in the Petition.

9.     Authorities have recently ordered a cleanup that will take many years to complete. This cleanup will result is the uncovering and handling of radioactive mill tailings wastes that will result in additional releases from the site. (This statement is provided for informational purposes only, as Plaintiffs are making no claims under the laws of the United States).

4

## I. JURISDICTION, AUTHORITY, AND VENUE

10.     The Twenty-First Judicial Circuit of the State of Missouri is St. Louis County has

jurisdiction and authority over the subject matter and the parties in this case because the causes

of action stated in this Petition arose out of business activities conducted solely in Missouri, and

out of torts committed solely in Missouri by resident and non-resident defendants.

11.     Complete diversity does not exist in this matter as Defendant Rock Road Industries was a

Missouri corporation at the time this action was commenced, and Plaintiffs are Missouri citizens.[1]

12.     Venue is proper in the Twenty-First Judicial Circuit of the State of Missouri in St. Louis

County pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action

took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price Anderson Act.

    A.  The Landfill is not and has never been a licensed nuclear facility.

    B.  Defendants have never received a license to possess, transport, or dispose of any

        radioactive wastes on or in the Landfill.

    C.  Defendants have never entered into an indemnification agreement with the United States

        government under 42 U.S.C. § 2210 with respect to the complained activities.

15.     Defendants Rock Road Industries and Bridgeton Landfill, LLC previously, and correctly,

declared that the Price-Anderson Act does not apply to them because the West Lake Landfill is

not a licensed nuclear facility: "Count One, arising under the Price-Anderson Act, is wholly

---

[1] When this action was initially filed on November 15, 2016, Rock Road Industries was a Missouri Corporation. Thereafter, on April 10, 2018, Rock Road Industries was merged into Bridgeton Landfill, LLC.

inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the nuclear Regulatory Commission."[2]

16.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification. This principle was clearly enunciated by the Hon. Neil Gorsuch in the case of *Cook v. Rockwell Intern. Corp*., 790 F.3d 1088 (10th. Cir. 2015) also known as the Rocky Flats litigation.

17.     Other decisions in the United States District Court, Eastern District of Missouri have determined that the Price Anderson Act does not apply to the same wastes at issue here because the Defendants lack the appropriate federal license or indemnity agreement to trigger the Price Anderson Act.[3]

18.     At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price-Anderson Act did not apply because the wastes at issue were not subject to said Act.

19.     Plaintiffs claims do not fall within the Jurisdiction of the Price Anderson Act because the mill tailings that Cotter disposed of and the Landfill Defendants accepted were not at the time subject to the Atomic Energy Act and the Price Anderson Act.[4]

---

[2] Defendants Rock Road Industries and Bridgeton Landfill, LLC's Memorandum in Support of Motion to Dismiss (Doc 15), Adams v. MI Holdings, Inc. Case No. 4:12-cv-00641-JCH
[3] See *Strong v. Republic Servs., Inc.*, 2017 WL 4758958 (E.D. Mo. 2017); see also *Banks* v. *Cotter Corporation*, 2019 WL 1426259.
[4] See Exhibit 1 – Declaration of Richard B. Stewart (April 24, 2018)

20.     Plaintiffs claims do not fall within the Jurisdiction of the Price Anderson Act because Cotter's disposal and the Landfill Defendants' acceptance of mill tailings was not undertaken pursuant to an appropriate federal license or indemnity agreement.[5]

21.     The Price-Anderson Act does not apply to the mill tailings wastes at issue in this Second Amended Petition.

## II. THE PARTIES

### Plaintiffs

22.     Plaintiffs Michael Dailey and Robbin Dailey are Missouri citizens who own real property located at 3550 El Ferrol Court, Bridgeton, Missouri (the "Dailey Property"). Plaintiffs purchased their home in 1999. The property is approximately 0.25 acres in St. Louis County adjacent to what is now the Landfill in Bridgeton, Missouri, more fully described as follows: Lot 18 in Subdivision Spanish Village Plat Two. Plaintiffs Michael Dailey and Robbin Dailey first learned that their property was contaminated with radioactive materials in 2016.

23.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to their property and the loss of use and enjoyment thereof.

### Defendants

24.     In this Petition, the defendants in this lawsuit are categorized into three groups, namely Landfill Owner Defendants, Landfill Operator Defendants (collectively "Landfill Defendants"), and Radioactive Waste Disposer Defendant: [6]

    A.  Landfill Owner Defendants

---

[5] Id.

[6] When this action was initially commenced it also included Radioactive Waste Generator Defendants MI Holdings, Inc. and Mallinckrodt Inc. In Plaintiffs first Amended Complaint, this action was brought against the Radioactive Waste Generator Defendant Mallinckrodt, LLC. Thereafter, Plaintiffs settled with Mallinckrodt, LLC and the claims against them were dismissed on March 20, 2018.

    i.     Bridgeton Landfill, LLC, which owns the Bridgeton and West Lake Landfills; and

    ii.    Rock Road Industries, Inc., which owned or owns the West Lake Landfill.[7]

B.  Landfill Operator Defendants[8]

    i.     Republic Services, Inc., which owns, oversees, and directs the environmental decisions and conduct of Bridgeton Landfill, LLC, Allied Services, L.L.C., and Rock Road Industries, Inc., and operates the Bridgeton and West Lake Landfills; and

    ii.    Allied Services, L.L.C, which operates Bridgeton and West Lake Landfills.

C.  Radioactive Waste Disposer Defendant

    iii.   Cotter Corporation, which owned and disposed of the hazardous, toxic, carcinogenic, radioactive residue wastes.

25.    Bridgeton Landfill, LLC formerly "Laidlaw Waste Systems" ("Landfill Owner") is a Delaware limited liability company with its principle place of business in the State of Missouri. It continuously and systematically conducts business activities in the State of Missouri.

A.  Upon information and belief, Bridgeton Landfill, LLC owns the Bridgeton Landfill and the West Lake Landfill.

B.  Bridgeton Landfill has continuously and systematically availed itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried there.

C.  This lawsuit arises out of damages that resulted from Bridgeton Landfill's acts and omissions within the State of Missouri. Specifically, since 2008, Bridgeton Landfill has

---

[7] As noted in footnote 1, Rock Road Industries, Inc. was a Missouri corporation at the time this action was commenced.

owned, operated and maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton Landfill and the West Lake Landfill, which gave rise to the violations of law and damage to property alleged in this Petition.

26.     Rock Road Industries, Inc. ("Road Road") was a Missouri corporation with its principle place of business in St. Louis Missouri at the time this action was commenced. Rock Road was a wholly-owned subsidiary of Republic Services, Inc. that continuously and systematically conducted business in the State of Missouri. After commencement of this action, Rock Road was merged into Bridgeton Landfill, LLC on April 10, 2018.

    A. This lawsuit arises out of damages that resulted from Rock Road Industries, Inc.'s acts and omissions within the State of Missouri. Upon information and belief Rock Road Industries, Inc. owned the West Lake Landfill along with Bridgeton Landfill, LLC. Rock Road Industries maintained daily operational and managerial control over the management and environmental decisions of the West Lake Landfill, decisions which gave rise to the violations of law and damage to property alleged in this Petition

27.     Republic Services, Inc. ("Republic") is a Delaware corporation with its principal place of business in the State of Arizona that carries on continuous and systematic business activities within the State of Missouri.

    A. Republic describes itself as a "leader in the domestic non-hazardous solid waste industry, as measured by revenue as well as a Fortune 500 company, publicly traded on the New York Stock Exchange (NYSE: RSF)."[9] Despite Republic's record of violations and the widespread injuries resulting from Republic's conduct, Republic promises the public that it lives by

---

[9] https://www.republicservices.com/about-us

4840-7843-1124, v. 4

"high environmental and sustainability standards."[10] Republic has engaged in extensive professional public relations efforts to downplay the significance of the problem, and their misleading statements can only be characterized as mere "puffery."

B. Republic's presence in Missouri is immense, servicing more than 300 cities and towns throughout the state, including many in St. Louis County.[11] Republic continuously and systematically avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried there. Republic is responsible for promulgating and enforcing environmental and health and safety policies and procedures to its subsidiaries, which in this case they failed to adequately do.

C. This lawsuit arises out of damages that resulted from Republic's acts and omissions within the State of Missouri. Since 2008, Republic and its subsidiaries have maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton and West Lake Landfills, decisions which gave rise to the violations of law and damage to property alleged in this Petition. Republic did so directly and through its subsidiaries Allied Services, LLC, Bridgeton Landfill LLC, and Rock Road Industries, Inc.

28. Allied Services, LLC ("Allied"), a Delaware limited liability company with its principal place of business in the state of Arizona, is a wholly-owned subsidiary of Republic Services, Inc., that continuously and systematically conducts business in the State of Missouri under its own name and under the fictitious name "Republic Services of Bridgeton."

A. Allied conducts daily operations of the Bridgeton Landfill and the West Lake Landfill.

---

[10] http://www.republicservices.com/customer-support/facilities
[11] https://www.republicservices.com/locations/missouri

10

B. Allied regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried there.

C. This lawsuit arises out of damages that resulted from Allied's acts and omissions within the State of Missouri. Since 2008, Allied has maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton and West Lake Landfills, decisions which gave rise to the violations of law and damage to property alleged in this Petition.

D. Allied has also promulgated environmental and health and safety policies and procedures to its subsidiaries, which in this case they failed to adequately do.

29.     Cotter Corporation ("Cotter") is a Colorado corporation with its principle place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation.

A. Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, as well as through its parent company General Atomics, Inc.

B. This lawsuit arises out of damages that resulted from the Cotter's conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter, which gave rise to the violations of law and damage to property alleged in the Petition.

## III. FACTS

### Radioactive Wastes

30.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.[12]

---

[12] *Allen v. United States*, 588 F. Supp. 247, 292 (D. Utah 1984), rev'd, 816 F.2d 1417 (10th Cir. 1987). Citing J.C. Giddings, *Chemistry, Man & Environmental Change* 412 (1973).

31.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

32.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization[13] which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

33.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

34.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the

---

[13] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions. Ionizing radiation has enough energy to cause changes in atoms through a process called ionization. Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

biological effects can still be gravely serious. The second characteristic is that there are latent biological effects of radiation.

35.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

36.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later. These injuries include birth abnormalities and cancer.

37.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

38.     Radium-226 has a half-life of 1,600 years.  Radium-226 eventually decays to lead- 210 and polonium-210. This means that as the radium-226 decays, it increases the lead-210 and polonium-210 at the Landfill and in the surrounding environment. Furthermore, half of the hazardous, carcinogenic radium-226 currently contaminating the West Lake Landfill will still remain as a

13

grave problem even after 1,000 years from now if it is not physically removed. This is described in the scientific literature as follows:

> Importantly, because the concentrations of short-lived radionuclides will progressively increase, the radioactivity at the site will likewise increase for the foreseeable future. For example, according to NRC, if the present day activity of $^{230}$Th is estimated to be 100 times that of $^{226}$Ra, then the alpha activity due to $^{226}$Ra decay will increase fivefold over present levels in 100 years, nine-fold in 200 years, and 35-fold in 1000 years.[14]

## Radioactive Waste in the St. Louis Area

39.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[15] Milling is the first step in processing natural Uranium ore and the milling process generates a sandy process waste known as "mill tailings" which contain radioactive decay products. In the late 1940's, the Manhattan Project acquired land near Lambert airport to store the Uranium ore mill tailings wastes from the processing operations in downtown St. Louis. The storage site near the airport is now referred to as the St. Louis Airport Site or SLAPS ("SLAPS"). Radioactive mill tailings wastes accumulated at SLAPS.

40.     In the 1960's, leftover mill tailings (ore residues, and uranium, and radium-bearing process wastes) that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site"). Mill tailings at the Latty Avenue Site included Uranium.

---

[14] Robert E. Criss, *Risk and Character of Radioactive Waste at the West Lake Landfill 1, Bridgeton, Missouri, Department of Earth and Planetary Sciences, Washington University, St. Louis, MO,* Mar. 14, 2013 (footnotes omitted [hereinafter "Criss (2013)"].

[15] Robert Alvarez, *The West Lake Landfill: A Radioactive Legacy of the Nuclear Arms Race* 8, Nov. 21, 2013 (footnotes and citations omitted) [hereinafter "Alvarez (2013)"]; *see also* Denise DeGarmo, *The Disposal of Radioactive Wastes in the Metropolitan St. Louis Area, The Environmental Health Legacy of the Mallinckrodt Chemical Works* 57, 62, 143 (Edwin Mellen Press 2006) (footnotes omitted) [hereinafter "DeGarmo (2006)"].

41.     In the late 1960's, Cotter purchased the Uranium mill tailings stored at both SLAPS and at the Latty Avenue Site.

42.     Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

43.     Cotter did not receive indemnity from the government in connection with this transaction.

44.     Between 1969 and 1973, Cotter stored, processed, and transported the mill tailings at the SLAPS and Latty Avenue sites.

45.     On or about 1973, Cotter mixed uranium mill tailings wastes with soil and upon information and belief they marketed the mill tailings as daily cover for landfill operations. Daily cover is the layer of soil that is laid on top of the day's deposition of waste at an operational landfill.

46.     On or about 1973, Cotter caused to be dumped, and the Landfill Defendants accepted, over 46,000 tons of radioactive mill tailings wastes without any permit whatsoever.

47.     Upon information and belief, despite knowing that Cotter was trying to dispose of dangerous radioactive materials for which the Landfill was not permitted to accept, the radioactive mill tailings waste was used by the Landfill Defendants as daily cover for the Landfill. The Landfill Defendants permitted the dumping of radioactive mill tailings wastes into the Landfill and intentionally spread these wastes over a large area.

48.     The scientific literature summarizes the dumping as follows:

> In 1973, 8700 tons of radionuclide-bearing "leached barium sulfate" was allegedly dumped in an unlined Landfill in Bridgeton, MO that was not licensed to receive radwaste. This report finds that 1) the chemical and physical character of the radioactive materials has not been adequately characterized, and barium sulfate is probably not a major constituent; 2) the alpha and beta emissions of this material will increase 10x to 100x over present levels, reaching maximum

activity in about 9000 years; 3) the Landfill has no protective
barriers and a proximal subsurface fire; 4) the site has several
hydrologic and geologic risk factors that magnify its unsatisfactory
location in a populated area; 5) nuclear material has been in contact
with percolating waters and with a fluctuating water table; 6)
groundwaters contaminated with radionuclides have migrated far
from the original location of disposal; 7) background levels of
radiation have been overstated, while other risks have been
underestimated ….[16]

## The Landfill

49.     The West Lake Landfill is situated on about 200 acres at 13570 St. Charles Rock Road, in

the City of Bridgeton. The Missouri River lies about one and one-half miles to the north and west

of the Landfill. A shallow aquifer lies beneath the West Lake Landfill and surrounding

neighborhoods.

50.     Originally used for agriculture, the land became a limestone quarrying and crushing

operation in 1939.

51.     Beginning in the early 1950s, portions of the quarried areas and adjacent areas were used to

dispose of municipal refuse, chemical wastes, industrial solid wastes, and construction/demolition

debris.

52.     The Landfill was never designed to be an adequate storage or disposal site for radioactive

materials, nor was it ever licensed as such. Despite the Landfill not being properly designed to

receive radioactive materials, the Landfill Defendants accepted hazardous, toxic, carcinogenic,

radioactive mill tailings wastes and spread them around the Landfill.

53.     The inadequacies of the Landfill itself are described in the scientific literature as follows:

Although the West Lake Landfill contains significant amounts of
long-lived radiotoxic wastes such as those contained in federally
licensed commercial radioactive waste Landfills, it meets virtually

---

[16] Criss (2013) at 1.

> none of legal requirements governing shallow radioactive waste disposal to prevent off-site migration.[17]

54.     The data collected on and around the Landfill documents radioactive contamination of soil, water, and air.

> Onsite 226Ra concentrations in soils as high as 21,000 pCi/g were measured, compared to estimated background levels of 2 pCi/g. Elevated radium contents above the EPA's MCL of 5 pCi/l are also widespread in both the alluvial and bedrock aquifer within about 1500 feet of Areas 1 and Area 2. Airborne surveys established that external radiation levels exceeding 100μR/hr, while distal samples were <10 μR/hr. Levels recorded one meter above Area 2 were as high as 3-4 mR/hr, or as much as 400x higher than background. NRC reports that the subsequent addition of soil cover and construction debris to Areas 1 and 2 diminished these levels several fold.[18]

55.     Other toxic and hazardous materials are expected to have been released via the air pathway, in addition to the radioactive materials. This phenomenon contributes to the damages complained of herein.

56.     The Landfill stopped accepting waste on December 31, 2004 and is now used as a transfer station for municipal wastes.

57.     The Landfill waste mass encompasses approximately 52 acres with approximately 240 feet below the ground's surface and a total waste thickness of 320 feet.

## Radioactive Mill Tailing Wastes at the West Lake Landfill

58.     Defendants caused or contributed to the improper handling, storage, and disposal of an estimated 500,000 cubic yards of radioactive mill tailings wastes in the Landfill. As a result, about

---

[17] Marco Kaltofen et al, Tracking legacy radionuclides in St. Louis, Missouri, via unsupported[210]Pb at 104, *Journal of Environmental Radioactivity,* Vol. 153 (2016) [hereinafter "Kaltofen (2016)"].

[18] Criss (2013) at 2 (citations omitted)

15 acres of the West Lake Landfill are filled with radioactive mill tailings waste at depths up to 20 feet.

59.     Cotter failed to obtain a license from any governmental authority to transport radioactive mill tailings wastes to the West Lake Landfill. The West Lake Landfill failed to obtain any governmental authority to receive or possess radioactive mill tailings wastes from Cotter. The West Lake Landfill was not sited, designed, nor operated as a land disposal facility suitable for radioactive waste in accordance with any governmental authority. The Landfill is not and has never been licensed by the NRC as a land disposal site or to receive or possess radioactive material. (These statements are provided for informational purposes only, as Plaintiffs are making no claims under the laws of the United States).

60.     Upon information and belief, Defendants who operated the Landfill used the radioactive mill tailings waste mixed with radioactive soil as daily cover in its Landfill operations thereby spreading the waste throughout the Landfill.

61.     Defendants did not take necessary safety precautions when disposing of and handling the radioactive mill tailings wastes and radioactive soil to prevent off-site contamination.

62.     The staff of the Landfill was neither qualified, nor trained to handle or dispose of radioactive wastes in a safe manner.

63.     The Landfill was not intended, nor designed to contain mill tailing radioactive wastes. In reality, the Landfill is a chaotic pile of debris covered by unmanaged "natural vegetation, surrounded by a fence with radioactive [warning] signs." Given the significant design and operations deficiencies, experts contend that the Landfill is even unsuitable for ordinary domestic waste.[19]

---

[19] Criss (2013) at 4

## The Fire

64.     The Landfill has experienced problems with subsurface fires throughout its operational history. Despite having past experiences with subsurface fires, sufficient precautionary measures were not implemented to prevent future fires or to protect the radiologically contaminated areas from being affected.

65.     Upon information and belief, Defendants discovered high temperatures in several monitoring wells. Upon information and belief, Defendants continued with aggressive gas extraction methods exacerbating the underground fire and enabling it to spread uncontrolled. Defendants finally reported to authorities that the Landfill was experiencing high temperatures on extraction wells evidencing a subsurface smoldering event.

66.     Since then, the smoldering has intensified into a spreading subsurface fire evidenced by surface soil settlement, increased odors, elevated hydrogen levels, and high temperatures. High temperatures and smoke caused by the fire could mobilize radionuclides into the air and ultimately into soil, surface water, ground water.

67.     Due to the fact that the radioactive material was used as daily cover around the landfill, it is more likely than not that some fire has already consumed radioactive material.  If there is sufficient contact with radioactive material, hot gases from the fire will likely cause fissures in the overburden material. These fissures will allow additional quantities of radioactive radon gas to escape the Landfill and become deposited as lead- 210 onto Plaintiffs' property as it decays.

68.     A subsurface fire in the radioactively contaminated areas would be expected to create increased pressure conditions within the Landfill and force out entrained radioactive gases, including radon which is extremely toxic to breathe. A subsurface fire may be present in the radioactively contaminated areas for a long period of time before it is detected, because the only

19

apparent means to detect a subsurface smoldering event after closure is through annual visual inspections.

69.     Another effect of a subsurface fire or smoldering event would be increased leachate production which has been observed in the Bridgeton Landfill from condensation of large amounts of steam.[20]

70.     The literature describes the risk of the Landfill underground fire as follows:

> An underground fire is currently ongoing in the municipal Landfill (OU-2) that is immediately south of Area 1 of OU-1. Such fires can burn for years, creating high underground temperatures, and releasing carbon monoxide, dioxins, VOCs and other noxious chemicals, and particulates into air. Numerous people who reside near the Landfill complained about odor and health problems at the January 17, 2013 public meeting in Bridgeton. Risks for adjacent, radionuclide-bearing OU-1 include but are not restricted to the following 1) fire can spread from OU-2 into OU-1, particularly because demolition and construction Landfills are known to have much higher risk than municipal Landfills; 2: subterranean fires can result in Landfills collapse, landslides and slumping, endangering personnel and exposing dangerous materials to the surface; 3) Landfill fires have high explosion risk because of methane, gas cylinders, and drums; 4) high temperatures and smoke could mobilize radionuclides into surface water, ground water and air.[21]

71.     There are at least two human exposure risk pathways that would exist from a subsurface smoldering event or subsurface fire reaching the radioactive materials. The first is the risk of people being subjected to increased air exposures to contaminants such as breathing in radon gas, radon-226. As airborne concentrations of radon gas increase, so would the risk to the neighboring population of breathing in radon gas and developing injuries such as lung cancers. Additionally, as radon gas decays it will become deposited onto people's property and in their homes as

---

[20] Leachate means liquid that has percolated through solid waste or has come in contact with solid waste and has extracted, dissolved or suspended materials from it. Mo. Code Regs. Ann. tit. 10, § 80-2.010.
[21] Criss (2013) at 4-5 (citations omitted).

radioactive lead-210 and polonium-210 which would subject people to increased risk of internal exposure to radioactive materials. The second pathway is increased leachate production that could further move contaminants and radioactive materials into the groundwater.

72.     Despite these risks, the Landfill Defendants have allowed the subsurface fire to spread uncontrolled.

73.     From the start of the subsurface smoldering event and throughout the subsequent fire, Plaintiffs have regularly encountered noxious, putrid, and offensive odors on their property coming from the Landfill, which diminishes quality of life, results in lost property value and is an absolute nuisance.

### The Spread of Defendants Radioactive Wastes to Off-Site Businesses and Homes

74.     As stated herein, Defendants have violated numerous Missouri standards for protection against radiation. Defendants' negligent handling, storage, and disposal of radioactive wastes and radioactive soil as daily cover caused dangerous contaminants to be deposited in several areas throughout the Landfill site and to be highly susceptible to off-site migration of radioactive materials including radon gas, radioactive particles, and radioactively-contaminated groundwater

75.     An example of water impacts of the Landfill will put this in perspective. Every day, the Landfill generates about 150,000 gallons of contaminated hazardous liquid leachate waste. In a doomed attempt to capture that waste, the Landfill Defendants installed a leachate collection system.  But the leachate collection system itself was inadequate and has resulted in spills, releases, and leaks that have contributed to the groundwater and surface water contamination in the area.

76.     Radiological and organic contamination was also detected in trees adjacent to and off-site from the Landfill. The presence of radioactive contamination in the trees resulted from the uptake of off-site contamination from the Landfill.

77.     Recent studies of the Landfill area document radioactive radon gas emissions from the Landfill are falling out and contaminating soil. Kaltofen reported the following:

> Levels of $^{210}$Pb in key samples were well above background activities, and were significantly out of secular equilibrium with other members of the uranium decay chain. This is strong evidence that the $^{210}$Pb originated by decay of short-lived, fugitive radon gas that escaped the Landfill.[22]

78.     Importantly, wherever lead-210 occurs, it will decay to polonium-210, creating an additional dose, as a matter of the laws of physics.

79.     In addition, recent studies of surface water runoff from the Landfill, particularly after heavy rains, document radioactive contaminated surface water runoff to off-site properties.[23]

80.     Critical to the legacy of radioactive particles contaminating the homes and communities surrounding the Landfill is that the radioactive contamination has gone off-site.

81.     Landfill Defendants have a long and consistent history of consciously disregarding the regulations for the control of radiation in Missouri by:

    A.  failing to make such surveys as are reasonably necessary to comply with the regulations;

    B.  failing to post adequate warning signs as required by the regulations;

    C.  failing to obtain a specific license for the handling of radioactive materials and wastes;

    D.  failing to adequately monitor or control its offsite effluent by air and water;

    E.  failing to provide dosimetry to workers and more than occasional visits by members of the general public to the site;

---

[22] Kaltofen (2016) at 110.
[23] EPA Finds Radiation in West Lake Landfill Runoff, *CBS St. Louis*, May 26, 2016, http://stlouis.cbslocal.com2016/05/26/epa-finds-radiation-inwestlake-landfill-runoff.

F.   failing to have an adequate or proper radiation protection program for its workers, despite knowledge of the significant potential for those workers to be exposed to material emitting gamma, beta, alpha radiation;

G.   allowing off-site migration of the radioactive materials, resulting in a release to an unrestricted area;

H.   allowing excessive radon emanation from the landfill;

I.   allowing unmonitored offsite migration of contaminated surface waters without a specific license;

J.   failing to maintain adequate waste exposure records and reports;

K.   failing retain and employ qualified radiation protection experts;

L.   failing to supply former workers with a summary of their radiation dose;

M.   failing to see that all work with radioactive materials is carried under conditions which will minimize the possibility of spread of radioactive materials;

N.   failing to monitor the workplace and prevent worker or visitors' clothing from becoming contaminated with radioactive materials;

O.   failing to require third parties who were disposing of radioactive material at the site to obtain a specific license;

P.   allowing the disposal of radioactive waste materials by dumping or burial at a site not approved by the Department of Health;

Q.   failing to have an accurate accounting for all radioactive materials at the site; and

R.   failing to have records which show the amount of radioactive material received, transferred, decayed in storage, disposed of, and other information as may be necessary

23

to account for the difference between the amount of radioactive material received or produced and the amount on hand.

82.    Defendants essentially violated every Missouri regulation related to radiation exposure.

83.    Due to risk of gamma radiation exposure, governmental authorities have directed Republic to cover portions of the landfill with six inches of fill to protect workers and innocent members of the general public who will be exposed to gamma radiation if they are in that area.

84.    This zone of excessive gamma radiation was identified in 1978 during a surveillance flight by the NRC.  Despite being informed of this zone of excessive gamma radiation, the Landfill Defendants did nothing.

85.    The only time Defendants takes any action to remediate or protect workers or the public from radioactive wastes is when ordered to do so by a governmental body.

86.    A recent study of the wastes that have come from the Landfill and migrated off-site to contaminate local businesses and homes stated the following:

> Analysis of 287 soil, sediment and house dust samples collected in a 200km2 zone in northern St. Louis County, Missouri, establish that off-site migration of radiological contaminants from Manhattan Project-era uranium processing wastes has occurred in this populated area.

### Concealment of Facts Related to Risk

87.    Republic and other Defendants through their silence have reassured government officials, the public and Plaintiffs that the Landfill has not contaminated nearby properties. In particular, Republic and its representatives, as well as its professional public relations firm(s), with their puff talk that they really care have made misrepresentations that were meant to assure Plaintiffs that:

24

A. Any suspicion of off-site contamination from the Landfill are merely rumors "being spread by alarmists."[24]

B. Its activities "should reassure the community that they are safe from and not being exposed to any risk from groundwater beneath West Lake Landfill."[25]

C. The Landfill's neighbors, including the Plaintiffs "can rest assured that they are safe."[26]

D. The fire and Landfill are both at a "managed state."[27]

E. The waste at the Landfill presents no danger to public health.[28]

88.     Republic and other Defendants engaged in extensive professional public relations efforts to downplay the significance of the problem and the dangers associated with radioactive wastes sitting in a landfill which experts indicate is not even suitable for household garbage, as it contains no liner. Defendants misrepresentations can only be characterized as mere "puffery".

**Defendants' Radioactive Particles Contaminated the Plaintiffs Property**

89.     The Dailey Property is contaminated by radioactive material.

90.     Samples taken on and around the Dailey Property confirm an elevated presence of radioactive particles.

91.     Dust samples from inside the Dailey Home contain decay products of radioactive isotopes U-238, including Th-230, Ra-226 and Pb-210, which match the *fingerprint* (or profile) of the hazardous, toxic, carcinogenic radioactive wastes generated from the processing of uranium ore in downtown St. Louis which was subsequently stored at SLAPS and Latty Avenue before being

---

[24] Jacob Barker, Radium above federal guidelines in groundwater near West Lake at 2, *St. Louis Today*, Dec. 17, 2014.
[25] *Id*.
[26] Jacob Barker, Frustration with EPA handling of West Lake growing at 5, *St. Louis Today*, Jan. 3, 2015.
[27] *Frustration with EPA handling of West Lake growing*, Jacob Barker, St. Louis Today, January 3, 2015 at p. 5.
[28] *Id.*

disposed of in the Landfill. These dusts show levels of radioactive Th-230 at least two hundred times above background.

92.     The Dailey Property neighbors the Landfill. This proximity puts the Plaintiffs' Property in the direct path of radioactive and other hazardous air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, radon gas, and frequent offensive odors; all of which emanate from the Landfill.

93.     The Kaltofen (2016) published scientific paper identified "strong evidence of short lived fugitive radon gas that escaped from the landfill."[29] These air emissions fall out to soil and dust as $^{210}$Pb, a highly radioactive isotope.

94.     It is also clear that radioactive material will be distributed from the Landfill "by surface water and winds."[21] The surface water runoff threat is heightened during periods of high rainfall and flooding and has been documented.[30]

95.     Frequent offensive odors from the Landfill are experienced by Plaintiffs.

96.     The radioactive wastes, which are hazardous, toxic, carcinogenic, that have polluted the Dailey Property and continue to threaten, especially during the proposed cleanup, to further pollute the Dailey Property match the waste fingerprint (or profile) of the hazardous, toxic, carcinogenic radioactive mill tailings wastes dumped in the Landfill.

97.     This radioactive contamination on the Dailey Property migrated from the  Landfill. The contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

---

[29] Kaltofen (2016) at 111.
[30] EPA Finds Radiation in West Lake Landfill Runoff, *CBS St. Louis*, May 26, 2016, http://stlouis.cbslocal.com2016/05/26/epa-finds-radiation-inwestlake-landfill-runoff.

98.     Radioactive contamination of the Dailey Property and frequent offensive odors render the Dailey Property unfit for normal use and enjoyment, and destroys its fair market value.

99.     As a direct and proximate result of Defendants' conduct, Plaintiffs are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination on the Dailey Property.

## COUNT I - TRESPASS

100.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

101.    Plaintiffs Michael Dailey and Robbin Dailey own and control the Dailey Property located at 3550 El Ferrol Court, more particularly described in Paragraph 19 above.

102.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills, which adjoins Plaintiffs' property.

103.    Landfill Defendants store and/or transport radioactive materials and other toxic and hazardous wastes on their property.

104.    Cotter purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes. Cotter intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

105.    Landfill Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

106.    Landfill Defendants have caused these radioactive materials to migrate from their property and contaminate Plaintiffs' property.

27

107.    Landfill Defendants willfully, wantonly, and maliciously caused the emission of radon gas, and radioactive particles onto and around Plaintiffs' property through their Landfill operations.

108.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

109.    The migration of radon gas and radioactive particles from Landfill Defendants' property onto Plaintiffs' property has resulted and continues to result in direct physical interference with Plaintiffs' property. Such contamination is incompatible with the normal use and enjoyment of Plaintiffs' Property.

110.    Plaintiffs did not give Defendants permission or consent to interfere with their property in this manner. Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store hazardous, toxic, carcinogenic, radioactive wastes.

111.    The contamination of Plaintiffs' property with radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

112.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT II – PERMANENT NUISANCE

113.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

114.    Plaintiffs Michael Dailey and Robbin Dailey own and control the Dailey Property located at 3550 El Ferrol Court, more particularly described in Paragraph 19 above.

115.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills, which adjoins Plaintiffs' property.

28

116.    Defendants unreasonably and unlawfully stored and used radioactive materials at the Landfill, which adjoins Plaintiffs' property.

117.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

118.    The Landfill and the radioactive waste that the Landfill contains are a permanent construction that is necessarily injurious to Plaintiffs as installed. It is not practical or possible to abate the presence of the Landfill or the radioactive waste stored there.

119.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se.*

120.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

121.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

122.    Landfill Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.

123.    Landfill Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

124.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE

125.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

126.    Plaintiffs Michael Dailey and Robbin Dailey own and control the Dailey Property located at 3550 El Ferrol Court, more particularly described in Paragraph 19 above.

127.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills, which adjoins Plaintiffs' property.

128.    Defendants unreasonably and unlawfully store and use radioactive materials at the Landfill, which adjoins Plaintiffs' property.

129.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

130.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

131.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

132.    Landfill Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of noxious, offensive odors and various hazardous

substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.

133.   Landfill Defendants' use of the Landfill causes frequent and unrelenting noxious odors to invade Plaintiffs' property and prevents Plaintiffs from using their property.

134.   As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## <u>COUNT IV – NEGLIGENCE</u>

135.   Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

136.   Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low as is reasonably achievable.

137.   Knowing of the grave dangers posed by these wastes, Cotter owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

138.   Cotter was negligent in failing to ensure that the radioactive wastes were safely disposed of at an appropriate facility. Cotter negligently disposed of these radioactive wastes at a landfill located in a residential area that was not capable of safely and properly disposing of radioactive materials. The Landfill was not properly licensed, nor configured, nor staffed to handle the disposal of radioactive wastes. Upon information and belief, Cotter negligently encouraged the Landfill

31

operators to use the radioactive mill tailings wastes which were mixed with contaminated soil as daily cover.

139.    As a direct and proximate result of Cotter's failure to ensure that the radioactive wastes were properly disposed of at an appropriate facility, Plaintiffs suffered and continue to suffer injury to due to the radioactive contamination of their property, including diminished property value.

140.    The Landfill Defendants owed a duty to the Plaintiffs to operate the Landfill in a safe, legal, and reasonable manner so as not to contaminate and interfere with surrounding properties. The Landfill Defendants owed a duty not to accept radioactive wastes for which they were not licensed or qualified to handle. After accepting radioactive wastes, the Landfill Defendants had a duty to safely handle, store and/or dispose of the radioactive wastes in order to prevent significant injury to property and persons.

141.    Landfill Defendants were negligent in the construction, design, operating and maintenance of the Landfill.

142.    Landfill Defendants negligently accepted hazardous, toxic, carcinogenic radioactive mill tailings when the Landfill was not designed, nor staffed to handle the disposal of radioactive wastes. The negligent design and maintenance of the Landfill by Landfill Defendants failed to prevent the release of radon gas and radioactive particles and hazardous and toxic wastes onto surrounding properties in excess of guidelines.

143.    Landfill Defendants were negligent in accepting hazardous, toxic, carcinogenic radioactive mill tailings at a landfill located in a residential area that was not capable of safely and properly disposing of radioactive materials. The Landfill was not properly licensed, nor configured, nor staffed to handle the disposal of radioactive wastes.  Upon information and belief Defendants used the radioactive materials which were mixed with contaminated soil as daily cover.

32

144.     Upon information and belief, Landfill Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

145.     Landfill Defendants' negligent use of radioactive wastes mixed with radioactive soil as daily cover spread contamination into a broader area and prevented Defendants and regulators from knowing the location of these dangerous wastes. The negligent use of radioactive materials as daily cover in an unlined Landfill resulted in contamination of the groundwater underlying the Landfill and surrounding properties.

146.     Landfill Defendants were negligent in failing to prevent the subsurface fire. Defendants should have implemented adequate practices with respect to gas extraction to avoid subsurface fires after they initially dealt with problems with smoldering events and increased subsurface temperatures in the 1990's. The subsurface fire along with the resulting noxious odors and increased risk of significant radon gas emissions are a direct and proximate result of the Landfill Defendants' negligence in the operation of the Landfill. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

147.     Defendants' collective negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the Landfill has resulted in repeated releases of radon gas and radioactive particles and other hazardous materials as well as offensive odors onto Plaintiffs' property, in disregard of applicable regulations and property rights.

148.     Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances and noxious odors. Defendant's negligence diminished Plaintiffs' property value.

149.     The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

150.    Plaintiffs' injuries were the result of wastes disposed of and controlled by Defendants.

151.    Defendants' negligent acts and omissions were a direct and proximate cause of Plaintiffs' injuries. Plaintiffs are entitled to recover damages for damage to property and/or loss of use of property.

152.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT V – NEGLIGENCE PER SE

153.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

154.    Cotter violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, and the Missouri Hazardous Waste Management regulations, 10 C.S.R. 25-5.262, both of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

155.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation and Hazardous Waste Management were meant to protect.

156.    The contamination of Plaintiffs' property is the kind of injury that the regulations for protection against ionizing radiation were designed to prevent.

157.    Cotter's violations of the regulations for Protection against Ionizing Radiation and Hazardous Waste Management were the proximate cause of Plaintiffs' injuries.

158.    The Landfill Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. §

34

644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

159.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect.

160.    The contamination of Plaintiffs' property is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

161.    The Landfill Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

162.    Defendants' collective negligence throughout the history of the mishandling and improper dumping hazardous, toxic, carcinogenic, radioactive wastes in the Landfill area has resulted in repeated releases of radon gas and radioactive particles and other hazardous materials as well as offensive odors onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

163.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances and noxious odors. Defendant's negligence diminished Plaintiffs' property value.

164.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

35

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY

165.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

166.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

167.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

168.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

169.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

170.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

171.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the Landfill.

172.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF

173.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

174.   Defendants have tortiously contaminated Plaintiffs' property with hazardous, toxic, carcinogenic, radioactive wastes.

175.   The Defendants' tortious acts threaten the safety and normal use and enjoyment of the Plaintiffs' property.

176.   The radioactive contamination of Plaintiffs' property has caused a significant increased risk to Plaintiffs, and therefore Plaintiffs are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout their Property.

177.   The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

178.   Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the Dailey Property, consistent with contemporary scientific principles. Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

179.   Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

180.   Such injunctive and equitable relief will decrease the radioactive contamination risks of Plaintiffs' Property, decrease the interference with the use and enjoyment of said property, and further mitigate Plaintiffs' damages.

## COUNT XIII – PUNITIVE DAMAGES

181.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

182.    Defendants committed one or more of the willful, wanton, malicious, reckless, and outrageous acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

183.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs.

184.    The willful, wanton, malicious, reckless, and outrageous acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs pray for judgment in favor of Plaintiffs and against Defendants Bridgeton Landfill, LLC, Rock Road Industries, Inc, Republic Services, Inc., Allied Services, L.L.C., and Cotter Corporation, as well as awarding the following to Plaintiffs and against Defendants:

A. an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

38

B. an award of double damages for malicious trespass as provided for under <u>Mo. Rev. Stat. § 537.330</u>;

C. an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

D. costs and attorney fees;

E. interest on the above amounts as allowed by law, including but not limited to pre- and post-judgement interest;

F. for appropriate injunctive and equitable relief, including medical monitoring; and

G. for any further relief this Court deems just and proper.


Respectfully submitted,

*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805), *Pro Hac Vice*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
Phone: 504-399-0009
Facsimile: 504-291-1352
E-mail: ssmith@sch-llc.com
       bcooper@sch-llc.com
       cbrustowicz@sch-llc.com
       vcobb@sch-llc.com
*ATTORNEYS FOR PLAINTIFFS,*
*MICHAEL AND ROBBIN DAILEY*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.


*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805)